No. 99-353

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 325

303 Mont. 15

15 P. 3d 903

DAVID H. SCHWABE, as Personal Representative

of the Estate of MARK DAVID SCHWABE, Deceased,

Plaintiff and Appellant,

v.

CUSTER'S INN ASSOCIATES, LLP, and

DBSI REALTY CORPORATION,

Defendants and Respondents.

APPEAL FROM: District Court of the Sixteenth Judicial District,

In and for the County of Custer,

The Honorable Gary L. Day, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Robert L. Stephens, Jr., Billings, Montana; Richard J. Carstensen, Billings, Montana

For Respondents:

J. Robert Planalp, Landoe, Brown, Planalp, Braaksma & Reida, Bozeman, Montana

Submitted on Briefs: January 13, 2000
Decided: December 12, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 David H. Schwabe, as personal representative of the estate of Mark David Schwabe (hereinafter the Estate), appeals the summary judgment entered in favor of Custer's Inn Associates, LLP, and DBSI Realty Corporation (hereinafter collectively referred to as Custer's Inn), by the Sixteenth Judicial District Court, Custer County. The court determined that no material facts remained in dispute concerning the element of causation in the Estate's wrongful death action claim of negligence *per se*, entitling the Custer's Inn to judgment as a matter of law, and the Estate appealed.

¶2 We affirm.

¶3 The Estate raises four issues

1. Whether summary judgment in favor of Custer's Inn was proper based upon the District Court's ruling that common law negligence had not been pled.

2. Whether the District Court erred by not allowing the Estate to amend its complaint to specifically include a common law negligence theory.

3. Whether the District Court erred in granting summary judgment based solely on the violation of the statute requiring CPR personnel to be on site without regard to other administrative safety rules.

4. Whether the Estate was entitled to prior notice and opportunity for hearing before summary judgment was granted to Custer's Inn?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 This wrongful death action resulted from a tragic event that occurred on April 14, 1994, when 22-year-old Mark Schwabe drowned while swimming in Custer's Inn's indoor swimming pool in Miles City, Montana. He was discovered at the bottom of the deep end of the pool by his co-worker, Brian

Boeckel, who removed Schwabe and summoned help. The two men's stay at Custer's Inn was job related; both were employed by a Billings company and had been working that morning in Sidney, Montana.

¶5 Schwabe left their motel room that afternoon shortly after 2:00 p.m. to go swimming at the motel's pool. Boeckel remained in the room making business phone calls. Boeckel left the room to join Schwabe at the pool sometime between 30 and 40 minutes later. At first, he was unable to locate Schwabe, and called for and looked for him around the pool area and in the bathrooms adjacent to the pool. He observed Schwabe's clothing, shoes, glasses, and a towel located near the pool. He then discovered Schwabe face down at the bottom of the deep end, which was between seven and nine feet deep.

¶6 Boeckel grabbed a nearby "shepherd's crook," a rescue device located near the pool, and managed to pull Schwabe from the water onto the edge of the pool. At that time Boeckel observed that Schwabe's face was blue. Boeckel did not observe any physical signs that Schwabe was alive. Boeckel rushed to the front desk and a motel employee summoned emergency assistance at 2:48 p.m. Also at that time, the front desk clerk attempted to connect the 9-1-1 line to a pool-side phone so that a 9-1-1 dispatcher could give Boeckel instructions on how to perform CPR. The clerk was unable to make this connection. No employee of Custer's Inn on duty that day was certified in CPR.

¶7 Emergency personnel arrived at 2:51 p.m., attempted to resuscitate Schwabe, who showed no pulse or signs of breathing. Monitors showed no signs of any life-sustaining heart activity. Schwabe was taken to an emergency room in Miles City by ambulance, and arrived at 2:59 p.m. There, emergency room personnel continued to attempt resuscitation. No life-sustaining signs were detected. Mark Schwabe was pronounced dead at the hospital at 3:35 p.m.

¶8 Precisely how Mark Schwabe initially got into distress in the pool, how he drowned, and how long he was at the bottom of the pool remain unclear. The record is replete with speculation as to how and where he entered the pool and whether he actually swam, dove into, or merely walked into the deep end from the three-foot-deep shallow end. Testimony and expert opinions based on the medical record evidence indicate that he had eaten prior to swimming, he had poor eyesight and had removed his glasses prior to entering the pool, and that he was not a good swimmer. It is undisputed that the medical evidence demonstrates that he suffered no injury to his head or neck from diving into the pool. Expert testimony also indicated that a person can drown in approximately three to five minutes, and that irreversible brain damage occurs within ten minutes or less of underwater submersion. Evidence also indicates that Schwabe's body temperature was similar to the pool temperature.

¶9 David Schwabe, in his capacity as personal representative for the estate of Mark Schwabe, filed suit on July 19, 1996, claiming that both Defendants were negligent *per se* in failing to comply with statutory and administrative laws and regulations governing public swimming pool safety. The Estate alleged that Custer's Inn's violations were a substantial contributing cause to Mark Schwabe's death. The complaint was first filed in federal court, and was then transferred to state district court on October 29, 1996. The complaint included the following allegations:

5. That the defendants, each of them, were negligent in failing to comply with the rules and regulations for the maintenance of swimming pools as set forth by the Montana Department of Health and Environmental Sciences, Food and Consumer Safety Bureau.

6. That the regulations of the Montana Department of Health and Environmental Sciences, Food and Consumer Safety Bureau were designed to protect members of the public and patrons utilizing the CUSTER INN facilities.

7. That the violations of the safety regulations by the defendants were a substantial contributing cause to the death of the decedent, and the defendants are negligent *per se*.

¶10 Although throughout discovery it pursued its negligence *per se* claim, the Estate would later claim that it had also sufficiently pled general negligence under allegation number five. The original complaint did not set out separate counts or claims or causes of action.

¶11 On December 7, 1998, the District Court denied the Estate's motion for partial summary judgment on the issue of liability, concluding that "this case abounds with questions of material fact." The court likewise denied Custer's Inn's motion for summary judgment, concluding that "this case appears to have numerous issues of material facts."

¶12 The Estate's motion for summary judgment was not entirely focussed on its negligence *per se* theory, however. The Estate also pursued a strict or "absolute" liability theory by arguing that violation of the governing public pool laws and regulations established causation and liability as a matter of law. The Estate's brief included an argument section entitled "LIABILITY BASED UPON NEGLIGENCE PER SE AND NEGLIGENCE AS A MATTER OF LAW." The Estate did not discuss the elements of ordinary or common law negligence. In arguing its negligence *per se* theory, the Estate contended that Custer's Inn, by operating an unsafe pool in violation of state laws and regulations, was responsible for any damages that occurred by permitting Mark Schwabe to use the pool--which it argued was a public nuisance, as a matter of law. A cause for nuisance was not pled by the Estate. The Estate argued that Custer's Inn's conduct--in operating an unsafe pool and then not preventing the use of it by Mark Schwabe--was the proximate cause of the claimed damages.

¶13 On December 15, 1998, the District Court denied the Estate's motion to amend its original complaint to expressly include a general, common law negligence claim. The court concluded that the motion was not timely made, noting that the October 9, 1998 filing missed an October 2, 1998 deadline. The court observed that even if it did not strictly observe the deadline, "the motion is inappropriate at this time because it is filed a little over two (2) years following the filing of the original complaint" and was filed after summary judgment motions were filed by both parties, upon which the court had previously ruled. "Allowing the amendment of the complaint at this time would necessarily affect the substantial discovery that has taken place in this case."

¶14 The court also ruled that unless the Estate could demonstrate that the general negligence theory had

been explored during discovery, it could not be deemed "sufficiently pled" in the complaint. The court entered an order on February 17, 1999, and determined that the Estate had failed to offer such proof, and therefore could not establish the sufficiency of its pleadings with respect to an ordinary common law negligence claim.

¶15 At a pretrial conference, on April 4, 1999, the District Court discussed the replacement of one of the Estate's proposed expert witnesses, who would testify regarding the causation between the lack of a CPR-trained employee at Custer's Inn and Mark Schwabe's drowning. The court specifically asked whether the Estate would have an expert who would be able to testify, essentially, that but for the lack of a CPR-trained employee at the motel, Mark Schwabe could have been resuscitated, and would not have died. Counsel for the Estate stated that "[n]o one will go that far, Judge." Counsel for the Defendants then informed the court that they would have a medical expert testify that no amount of CPR would have saved Schwabe's life. Hearing this, the court stated:

> I denied the Defendant's motion for summary judgment last December . . . . I have looked and I have the right to revisit that. And I think I am going to grant the Defendant's motion for summary judgment [and] vacate the trial date . . . . One of the reasons that I denied Defendant's motion for summary judgment is because I felt that there were factual issues. The fact issues had to do with if those regulations were in effect and did govern the use of this pool . . . how did that effect causation? And I can find no way that causation could be proven here except through the CPR.

¶16 The court issued its written summary judgment on May 18, 1999. The court concluded that Schwabe had failed to offer any proof that the conduct of Custer's Inn had caused Mark Schwabe's death. The court stated that it had "discovered that the Plaintiff has no expert who can testify with a reasonable degree of medical certainty that if the Defendants had had CPR-trained staff on duty that Mark Schwabe would have survived." Custer's Inn had filed an affidavit of a medical expert providing that at the time Mark Schwabe was removed from the pool, he was beyond resuscitation. Specifically, Dr. Thomas L. Bennet averred that Mark Schwabe had been in the water for a prolonged period of time, and that the Cardiac Run Report indicated that Mark Schwabe was "dead when the EMTs arrived." This expert opinion was deemed "unrebutted" by the District Court.

¶17 Therefore, the court concluded that there were no facts in the record upon which an expert could rely in concluding that "any violation or combination of violations of the Montana Health and Safety Rules caused Mark Schwabe's death."

¶18 The Estate appeals the court's summary judgment in favor of the Defendants.

## STANDARD OF REVIEW

¶19 This Court reviews an order granting summary judgment *de novo*, using the same Rule 56, M.R.Civ. P., criteria applied by the district court. *See Calcaterra v. Montana Resources*, 1998 MT 187, ¶ 9, 289

Mont. 424, ¶ 9, 962 P.2d 590, ¶ 9. This Court looks to the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to determine the existence or nonexistence of a genuine issue of material fact. *See Erker v. Kester*, 1999 MT 231, ¶ 17, 296 Mont. 123, ¶ 17, 988 P.2d 1221, ¶ 17.

¶20 Summary judgment is an extreme remedy which should be granted only when there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), M.R.Civ.P., *Calcaterra*, ¶ 9. The party seeking summary judgment, therefore, has the burden of demonstrating a complete absence of any genuine factual issues. *Calcaterra*, ¶ 9. The party seeking summary judgment also must overcome the burden that all reasonable inferences that might be drawn from the offered evidence will be drawn in favor of the party opposing summary judgment. *Erker*, ¶ 17.

¶21 Where the moving party is able to demonstrate that no genuine issue as to any material fact remains in dispute, however, the burden shifts to the party opposing the motion. *Calcaterra*, ¶ 9. This burden shift requires that the opposing party present material and substantial evidence, rather than merely conclusory or speculative statements, to raise a genuine issue of material fact. *Erker*, ¶ 17.

## DISCUSSION

¶22 The District Court concluded that even if Custer's Inn violated any combination of pool safety statutes or regulations at issue, the Estate nevertheless failed to establish that this alleged negligence *per se* caused the drowning death of Mark Schwabe. Thus, because causation was no longer in dispute--due to the unrebutted evidence and expert opinions set forth by Custer's Inn--the court determined that summary judgment in Custer's Inn's favor was appropriate.

¶23 In *VanLuchene v. State* (1990), 244 Mont. 397, 401, 797 P.2d 932, 935, we recited the five criteria that a plaintiff must prove in a negligence *per se* case in order to prevail. Those criteria are as follows: 1) the defendant violated the particular statute; 2) the statute was enacted to protect a specific class of persons; 3) the plaintiff is a member of that class; 4) the plaintiff's injury is of the sort the statute was enacted to prevent; and 5) the statute was intended to regulate members of defendant's class. *See also Nehring v. LaCounte* (1986), 219 Mont. 462, 468, 712 P.2d 1329, 1333.

¶24 Ordinary or common law negligence requires proof of four elements: 1) existence of a duty; 2) breach of the duty; 3) causation; and 4) damages. *See White v. Murdock* (1994), 265 Mont. 386, 389, 877 P.2d 474, 476. If a plaintiff is unable to establish any one element, the negligence claim fails. *See White*, 265 Mont. at 389-90, 877 P.2d at 476; *Dvorak v. Matador Serv., Inc.* (1986), 223 Mont. 98, 107, 727 P.2d 1306, 1311 (citations omitted).

¶25 One key distinction between negligence *per se* and ordinary negligence is that once a violation of a statute is proven, and the standards under *VanLuchene* are met, a defendant is negligent, as a matter of law. This contrasts to ordinary or common law negligence where the element of duty is a question of law, but the element of breach is generally a question of fact suitable for resolution by the fact finder at

trial, and is therefore far less susceptible to determination as a matter of law. *See generally Estate of Strever v. Cline* (1996), 278 Mont. 165, 175, 924 P.2d 666, 672. The breach of a statutory duty, under a negligence *per se* claim, may also carry the added advantage of foreclosing common law defenses. *See Steiner v. Department of Highways* (1994), 269 Mont. 270, 278, 887 P.2d 1228, 1233 (quoting *Polld v. Todd* (1966), 148 Mont. 171, 179-80, 418 P.2d 869, 873) (scaffolding safety laws foreclose the common-law defenses of assumption of the risk, contributory negligence, and negligence of a fellow servant).

¶26 Custer's Inn argues that where the two theories converge, however, is on the element of causation. The Estate has argued that "there is no specific requirement that you show a specific cause related to a specific violation." We agree with Custer's Inn.

¶27 Under either theory of negligence, if the defendant's conduct did not cause the alleged damages, the plaintiff's claim must fail as a matter of law. Thus, as this Court has often stated, liability does not become fixed upon a showing of negligence *per se*; rather, "there must be a determination of whether the violation was the proximate cause of the alleged injuries." *See*, *e.g.*, *Steiner*, 269 Mont. at 278, 887 P.2d at 1234; *Martel v. Montana Power Co.* (1988), 231 Mont. 96, 103, 752 P.2d 140, 145 (stating that jury instruction must provide that a violation of law is of no consequence unless it contributed as a proximate cause to an injury found by the jury to have been suffered by the plaintiff).

¶28 Accordingly, Custer's Inn asserts that whether the District Court erred by denying the Estate's motion to amend is immaterial at this point, and further suggests that even if the court's summary judgment is scrutinized under the Estate's common law theory, the result would be the same. Again, we agree with Custer's Inn.

¶29 The element of causation was the basis for the court's entry of summary judgment in favor of Custer's Inn. Pursuant to our *de novo* review, we conclude that even if the Estate's original complaint had sufficiently set forth a cause for ordinary negligence, or, alternatively, that the Estate should have been permitted to amend its complaint to include this claim, if the Estate nevertheless failed to establish any material fact dispute that the conduct of the Defendants' was the proximate cause of Mark Schwabe's drowning death, summary judgment was properly entered by the District Court.

¶30 Thus, we need not address issues number 1 and 2, and those portions of other issues in which the denial of the Estate's motion to amend is a factor. We proceed to the third issue raised by the Estate.

### Issue 3.

> *Did the District Court err in granting summary judgment based solely upon the statutory violation relating to CPR personnel, disregarding other violations of administrative and statutory safety rules?*

¶31Under this issue, our review is narrowed to whether any material facts pertaining to the issue of causation remain in dispute. To this end, we first observe that the Estate has misconstrued the District

Court's conclusion regarding CPR-trained personnel and other potential violations of statutory and administrative safety rules.

¶32 The court's conclusion regarding causation was expansive: "there are no facts in the record upon which an expert could rely in concluding that *any violation or combination of violations* of the Montana Health and Safety Rules caused Mark Schwabe's death." (Emphasis added). The court's specific reference to the CPR-trained personnel rule violation (pursuant to § 50-53-107(2), MCA, and Rule 16.1524(4), ARM)[(1)] was in response to the Estate's failure to produce an expert witness who would testify "with a reasonable degree of medical certainty that if the Defendants had had CPR-trained staff on duty that Mark Schwabe would have survived." A review of the pretrial conference transcript clearly reveals that the court determined that the Estate had failed to set forth any other legitimate causation theory at that point.

¶33 Next, Custer's Inn asserts that even if this Court assumes that the Defendants breached either a statutory or common law duty to operate a safe public pool facility, any or all such breaches cannot be construed as the proximate cause of Mark Schwabe's death. Custer's Inn argues, for example, that on-premises CPR-trained staff as required by law would have permitted resuscitation to commence at 2:48 p.m. rather than 2:51 p.m. when EMT personnel arrived. Custer's Inn argues that based on the overwhelming medical evidence, Mark Schwabe was beyond resuscitation at 2:48 p.m.--an opinion offered in its medical expert's affidavit and provided in an expert's disclosure statement report. Custer's Inn also argues that other suggested factors raised by the Estate on appeal, such as pool water temperature, the lack of adequate pool depth markings, the lack of an adequate floating shallow-end deep-end division rope, inadequate lighting, and the lack of a working pool-side emergency phone, have never been substantiated with any evidence whatsoever as contributing proximate causes throughout the course of discovery leading up to the District Court's entry of summary judgment.

¶34 Nevertheless, pursuant to our *de novo* review, we are obliged to draw all reasonable inferences from the offered evidence in favor of the party opposing summary judgment. *See Erker v. Kester*, 1999 MT 231, ¶ 17, 296 Mont. 123, ¶ 17, 988 P.2d 1221, ¶ 17. Further, we recognize that the element of causation, like breach, is usually a question of fact in negligence actions and is thus not ordinarily susceptible to summary judgment. *See Craig v. Schell*, 1999 MT 40, ¶ 12, 293 Mont. 323, ¶ 12, 975 P.2d 820, ¶ 12. Even so, we are mindful that a material fact issue concerning causation in a negligence case may be determined as a matter of law, as Custer's Inn suggests, where reasonable minds could reach but one conclusion as to whether a breach of a duty caused an accident. *See Craig*, ¶ 12. Further, the causation element is ordinarily satisfied if the alleged damage suffered by a plaintiff wouldn 't have occurred *but for* the defendant's conduct. *See Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 371, 916 P.2d 122, 139 (quoting Prosser & Keeton on Torts § 41 (5th ed. 1984)).

¶35 Our review of the Estate's arguments here, as well as its summary judgment brief and the record before the District Court, indicates that due to an apparent lack of direct causal evidence, it wishes to superimpose a strict liability or perhaps a *res ipsa loquitur* theory onto its negligence *per se* claim--meaning, causation may be inferred or need not be proven because Custer's Inn's pool facility was, as a

matter of law, "dangerous" or a "public nuisance." *See* § 50-53-108, MCA.

¶36 We conclude that this argument, under a theory of negligence *per se*, or ordinary negligence, is far too tenuous to establish causation under the test announced in *Busta*. As stated by a Georgia court in a similar case: "drowning is not an occurrence that is within itself sufficient to indicate that it must have been brought about by negligence on the part of someone. It is just as likely to happen as the result of accident, which is negligence of no one." *See Y.M.C.A. v. Bailey* (Ga.App. 1965), 146 S.E.2d 324, 333, cited with approval in *Johnson for Johnson v. Young Men's Christian Ass'n of Great Falls* (1982), 201 Mont. 36, 46, 651 P.2d 1245, 1251. Regardless of any lingering fact disputes over safety violations, therefore, the Estate still must demonstrate that if specific instances of Custer's Inn's actions or omissions are removed from the factual scenario, Mark Schwabe's drowning would not have occurred. *See Busta*, 276 Mont. at 371, 916 P.2d at 139.

¶37 To this end, the Estate has provided the testimony and opinions of two expert witnesses, both of whom reviewed the various factual accounts of Schwabe's drowning, including the detailed reports provided by emergency personnel who attempted to resuscitate Schwabe at the pool and at the hospital. One, MaryLou Iverson, a risk management consultant, was offered as an expert on pool safety. The other, Gerald Cormier, a pool inspector for the state of Montana, conducted and reviewed Custer's Inn's compliance with the various statutes and regulations at issue both before and after the drowning incident.

¶38 Iverson provided a report detailing the following opinions: 1) that the lack of attention paid to safety and risk reduction procedures were contributing factors in the drowning death of Mark Schwabe; 2) that Custer's Inn did not take pool safety seriously, based on her review of the record provided by the Estate's counsel; 3) had there been a shallow-end deep-end divider rope across the pool and more adequate marker numbers indicating pool depth changes, Mark "may not have gotten into trouble;"and (4) Custer's Inn did not meet a legal standard of care for operating a safe pool.

¶39 During her deposition, however, she stated that she could not positively identify one safety infraction in particular that caused Mark Schwabe's drowning, nor had she in fact inspected Custer's Inn's pool facility or conducted a thorough review of Montana's statutory and regulatory pool safety scheme.

¶40 Iverson's testimony thoroughly addressed the issue of the lack of a floating shallow-end deep-end divider rope across the pool, which she claimed could have prevented Schwabe from entering the deep end, and subsequently drowning. She admitted, however, that this opinion was speculative, and not based on any evidence or knowledge that such a rope was not in place at the time, or that Mark Schwabe in fact had entered the pool in the shallow end first and then had ventured to the deep end.

¶41 Likewise, testimony addressing the safety risk of the slope of the pool floor between the shallow end to the deep end indicated that this could have been a possible factor in causing Schwabe's drowning, but no evidence actually showed that it was factor, or that Schwabe touched bottom or attempted to touch bottom while in distress prior to drowning.

¶42 As for the lack of CPR-trained personnel, Iverson stated that the approximate two to five minute delay before emergency medical personnel arrived and began administering CPR could have made a difference in whether Mark Schwabe could have been resuscitated. She admitted, however, that she lacked knowledge of whether Schwabe, medically speaking, could have been resuscitated had CPR been administered more promptly. Also, Iverson stated that she was not qualified to give medical opinions concerning the cause of death, or at what point a person can or cannot be resuscitated.

¶43 In sum, Iverson testified that she had no idea what Schwabe was actually doing, or what actually occurred, at the time he drowned, or how long he was actually in the water prior to his drowning. At best, she offered suggestions as to how Custer's Inn's pool could be made safer in the future.

¶44 Cormier similarly testified that the various rule violations, including inadequate depth markings, lack of a floating safety line separating the shallow from the deep end, and the failure to have a CPR-trained employee on the premises created a "heightened atmosphere of risk" making it "more likely that a problem is going to occur" and therefore such circumstances, in his opinion, "substantially" contributed to the drowning of Mark Schwabe. Nevertheless, Cormier also testified:

> Q. However, you don't have an opinion that that heightened atmosphere of risk is any way responsible for Mr. Schwabe actually drowning that day; is that right?
>
> A. You're asking me to state with certainty, then, that because of the heightened atmosphere of risk, that he drowned?
>
> Q. Yes.
>
> A. I can't state that.

¶45 Although offering fairly detailed scenarios of what he "presumed" occurred, Cormier admitted that "[n]o one knows exactly what occurred" and that he lacked knowledge of what actually happened when Mark Schwabe entered the water that day.

¶46 The Estate was therefore unable to procure medical expert testimony to rebut Custer's Inn's expert opinion that "Mr. Schwabe was beyond resuscitation when his body was removed from the pool," or otherwise place in dispute that CPR resuscitation efforts immediately following Schwabe's removal from the pool could have saved his life. We conclude that the same holds true for the other alleged factors raised by the Estate: there is simply a paucity of evidence of what caused Mark Schwabe to become distressed and eventually drown in Custer's Inn's pool.

¶47 In light of the foregoing, the Estate optimistically claims in its brief to this Court that a "[g]ood argument can be made that if Custer's Inn had followed these administrative and statutory rules, we wouldn't be here today and Mark Schwabe would be alive."

¶48 We conclude that summary judgment was appropriate here, however, because after years of litigation, involving extensive discovery and the offering of opinions by numerous experts--as represented above-- this "good" argument was simply never substantiated with any material facts or any reasonably certain medical expert opinion indicating that Custer's Inn's alleged negligent actions or omissions proximately caused the drowning death of Mark Schwabe. *See Craig*, ¶ 12. At best, the Estate's assertions concerning causation, including those of its experts, are conclusory and speculative, which are an insufficient basis for this Court to reverse summary judgment.

¶49 Although when measured against state safety standards, Custer's Inn may have offered its guests, including Mark Schwabe, a less-than-safe place to swim in April of 1994, the uncontested medical expert testimony and evidence clearly removes the motel's conduct from the causation standard under our decision in *Busta*. In sum, pursuant to our *de novo* review of the record, even if we were to assume that Custer's Inn was negligent in every alleged respect, the Estate has failed to raise a genuine issue of material fact concerning causation. Therefore, the judgment of the District Court that entered summary judgment in favor of Custer's Inn is affirmed.

### Issue 4.

*Whether the Estate was entitled to prior notice and opportunity for hearing before summary judgment was granted to Custer's Inn.*

¶50 The Estate argues that the District Court reconsidered and granted Custer's Inn's motion for summary judgment at the April 4, 1999 pretrial conference without providing the Estate with any prior notice or opportunity to fully present its position regarding what issues of material fact regarding causation remained in dispute. The Estate claims, therefore, that this "sua sponte revisiting of summary judgment issues previously decided, at the time set for final pretrial conference, is tantamount to a judicial 'ambush'." The Estate argues that the court's order granting summary judgment should therefore be vacated because the court violated the Estate's right to due process. We disagree.

¶51 We review discretionary trial court rulings for an abuse of discretion. *See Konitz v. Claver*, 1998 MT 27, ¶ 32, 287 Mont. 301, ¶ 32, 954 P.2d 1138, ¶ 32 (citations omitted). Discretionary trial court rulings include such things as trial administration issues, scope of cross-examination, post-trial motions, and similar rulings. *See Konitz*, ¶ 32. We concluded in *Konitz* that a district court's decision whether to allow a party to testify at the summary judgment hearing was a discretionary ruling and was therefore subject to review for an abuse of discretion. *See Konitz*, ¶ 32. We apply the same standard of review in this instance as well.

¶52 Here, both parties moved for summary judgment in July of 1998, and fully briefed their respective motions. Following an August 18, 1998 hearing, the District Court denied both motions on December 7, 1998. Four months later, at the April 6, 1999 pretrial conference, the court observed that new evidence or new materials had arisen since its ruling on the original motions for summary judgment. Namely, after questioning counsel, the court realized that, contrary to prior indications made to the court, the

Estate would in fact be unable to produce expert testimony that would place the element of causation in dispute.

¶53 Consequently, the court informed both parties that it would therefore revisit its earlier summary judgment decision, and enter judgment in favor of the Defendants. The court provided both parties with a detailed oral pronouncement of its reasons. Then, six weeks later, on May 18, 1999, the court entered its written order granting the Defendants' motion for summary judgment.

¶54 As a general rule, an order denying summary judgment is interlocutory in character and not res judicata and is therefore subject to later review by the trial court, if circumstances warrant. *See generally State ex rel. Davis v. District Court* (1977), 172 Mont. 139, 140, 561 P.2d 912, 913; *State ex rel. Kosena v. District Court* (1977), 172 Mont. 21, 22, 560 P.2d 522, 523. Thus, because the court here denied both parties' motions for summary judgment, we conclude that both parties were effectively on notice, as of December 7, 1998, that the motions may be subject to later review at any time, either upon motion by the parties or at the court's discretion, in the furtherance of "good judicial administration," *State ex rel. Kosena*, 172 Mont. at 22, 560 P.2d at 523. Under the procedural circumstances here, we conclude that the District Court did not abuse its discretion by revisiting its earlier order denying summary judgment at the parties' pretrial conference.

¶55 Far more critical to our analysis, therefore, is the issue of whether the Estate was afforded the opportunity to present further evidence of material facts in dispute related to causation. As a general rule, an oral argument is required for summary judgment unless it is specifically waived by all parties. *See Cole v. Flathead County* (1989), 236 Mont. 412, 418-19, 771 P.2d 97, 101; *Linn v. City County Health Dept.*, 1999 MT 235, ¶ 8, 296 Mont. 145, ¶ 8, 988 P.2d 302, ¶ 8. This Court has stated that a district court may not, by rule or otherwise, preclude a party from requesting oral argument, nor deny such a request when made by a party opposing the motion. *See Aetna Life Ins. Co. v. Jordan* (1992), 254 Mont. 208, 211, 835 P.2d 770, 772 (quoting *Cole*, 236 Mont. at 418, 771 P.2d at 101).

¶56 At no time, however, did counsel for the Estate object to court's imposition of judgment on the grounds that the Estate was not provided a second summary judgment hearing (or adequate notice, for that matter). During and following the court's oral pronouncement, the Estate did not request a hearing, nor did it file any motions requesting any such relief from the court, either prior to or following entry of the written summary judgment.

¶57 The rule is well established that we do not consider issues raised for the first time on appeal, where the complaining party did not provide the district court with the opportunity to correct the alleged error. *See Johnson v. Barrett*, 1999 MT 594, ¶ 18, 295 Mont. 254, ¶ 18, 983 P.2d 925, ¶ 18; *Kearns v. McIntyre Const. Co.* (1977), 173 Mont. 239, 251, 567 P.2d 433, 440. Here, the Estate cannot now claim that it was denied something that was never requested of, or actually denied by, the District Court.

¶58 We hold, therefore, the District Court did not abuse its discretion when it entered summary judgment in favor of Custer's Inn at the parties' pretrial conference, and then in writing on May 18, 1999.

We conclude that the Estate was on notice that a summary judgment ruling could be revisited by the District Court, and that the District Court did not deny or otherwise preclude the Estate's right to a second summary judgment hearing.

¶Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JIM REGNIER

Justice W. William Leaphart, dissenting.

¶60 I dissent. The Court's ruling upholding summary judgment due to lack of direct evidence of causation allows Custer's Inn to take advantage of the very situation it created; that is, allowing Custer's Inn, through its own noncompliance with safety regulations, to evade trial on the merits.

The District Court's Analysis:

¶61 The Estate originally moved for partial summary judgment on liability contending that a pool open to the public may be a nuisance if certain public safety requirements are not met. In particular, the Estate contended that Custer's Inn was in violation of § 50-53-107(1), MCA (when lifeguard not required) and, among others, the following administrative regulations:

Rule 16.10.1524(3), ARM (no certified CPR personnel);

Rule 16.10.1525(7), ARM (guard lines separating shallow and deep end of pool);

Rule 16.10.1530(3), ARM (emergency telephone with posted instructions for emergency calls);

Rule 16.10.1506(3)(f), ARM (depth markings on side and top deck of pool).

¶62 In December of 1998, the District Court denied the Estate's motion stating: "In the Court's opinion this case abounds with questions of material fact and therefore denies this motion for partial summary judgment."

¶63 Then, in a subsequent decision in May of 1999, the court characterized its previous December, 1998

ruling as having been premised upon the Estate's representation that it would produce an expert witness who would testify that if Custer's Inn had a CPR trained person on staff, Mark Schwabe would not have drowned. Some six months later, when it became apparent that the Estate could not produce such an expert the District Court reconsidered its prior ruling, stating:

> Now however, the Court has discovered that the Plaintiff has no expert who can testify with a reasonable degree of medical certainty that if the Defendants had had CPR-trained staff on duty that Mark Schwabe would have survived. The Defendants have filed with the Court the Affidavit of Thomas L. Bennett, M.D., whose unrebutted opinion is that, at the time Mr. Schwabe was removed from the pool, he was beyond resuscitation . . . .

> The Court concludes that there are no facts in the record upon which an expert could rely in concluding that any violation or combination of violations of the Montana Health and Safety Rules caused Mark Schwabe's death. Any opinions that are made in this regard are speculative, which is not surprising given the lack of evidence in this case as to how Mark Schwabe drowned.

¶I64 t is thus apparent that the District Court reconsidered the summary judgment issue due to the Estate's inability to produce an expert who would say that, but for Custer's Inn's failure to have CPR-trained staff, Mark would not have drowned. Although that inability certainly bears on the question of whether the Estate could prove that violation of Rule 16.10.1524(3), ARM (certified CPR personnel) caused Mark's death, it does not in any way detract from the Estate's allegations that the failure to have adequate depth markings or a safety line were causative factors in his death. The District Court had previously held that the case "abounds with questions of material fact." The inability to produce a medical expert on resuscitation only defused one of the numerous allegations of safety deficiencies. As to the other alleged deficiencies, which are preventative in nature (no depth markings, no safety line), serious questions of material fact remained and summary judgment was inappropriate.

This Court's Analysis:

¶65 The Court rejects a *res ipsa* type analysis as being far too tenuous to establish causation as required in Busta v. Columbus Hosp. (1996), 276 Mont. 342, 371, 916 P.2d 122, 139. The Court cites to a Georgia decision from the Court of Appeals, Div. 2, for the proposition that "drowning is not an occurrence that is within itself sufficient to indicate that it *must* have been brought about by negligence on the part of someone. It is just as likely to happen as the result of accident, which is negligence of no one." *See* Y.M.C.A. v. Bailey (Ga. App. 1965), 146 S.E.2d 324, 333 (cited with approval by the Montana Supreme Court in Johnson v. Young Men's Christian Ass'n of Great Falls (1982), 201 Mont. 36, 46, 651 P.2d 1245, 1251).

¶66 I do not find either the *Bailey* case or the *Johnson* case to be persuasive in the present context.

¶67 The *Johnson* case involved a defense verdict in Johnson's suit against the Y.M.C.A. of Great Falls

(the "Y") for negligence in the care and supervision of his son, Mark, who was found submerged in the "Y" pool during a "free swim" period. Johnson appealed challenging various evidentiary issues and a jury instruction on the standard of care. Johnson also argued that the district court erred in failing to grant his motion for summary judgment on the issue of liability. This Court affirmed on all issues. *Johnson*, 201 Mont. at 47, 651 P.2d at 1251. It is noteworthy that in affirming the denial of summary judgment we recognized that the genuine issues of material fact as to the alleged safety violations precluded summary judgment. In particular, there were fact issues as to whether the "Y" had provided a sufficient ratio of lifeguards to pool users according to water safety procedure and a factual question of whether the "Y" had properly instructed its patrons in pool use in accordance with accepted water safety standards. *Johnson*, 201 Mont. at 47, 651 P.2d at 1251. Similarly, in the present case there were fact questions as to whether the Custer's Inn pool was deficient due to lack of depth markings and a safety line between the shallow and deep water. The District Court here, like the district court in *Johnson*, should have denied the summary judgment and allowed the trier of fact to determine whether the safety violations caused the drowning.

¶68 In *Bailey*, the Court noted that "the pool was clearly marked as to depth from the shallow end to the deep portion at the opposite end. There was nothing to indicate that it was defective in any respect or that it contained hidden mantraps or concealed dangers." *Bailey*, 146 S.E.2d at 332. Thus the *Bailey* case where there were no deficiencies, is in sharp contrast to the present case where, two weeks after the drowning, Jerry Cormier of the Montana Department of Health and Environmental Sciences inspected the Custer's Inn pool and found that there were no safety line partitions or backboards present and that the depth markings were inadequate. Furthermore, the pool has a hopper configuration on the bottom with a break at the five-foot depth where it drops sharply to nine feet. Cormier testified that this design is hazardous since a swimmer who gets in trouble and tries to bounce off the bottom of the pool to reach safety actually ends up getting fed into the deeper water. Cormier, in his deposition, concluded that "the combination of inadequacies, as noted in [my] reports and earlier testimony, was a significant contributing factor to the drowning death of Mark Schwabe on April 14, 1994."

¶69 While the Georgia court may have been correct in stating that a drowning is not an occurrence that is "within itself sufficient" to indicate that it must have been brought about by the negligence on the part of someone, a drowning which occurs in a hopper-shaped pool with no safety line partition between the deep and shallow end and no adequate depth markings, is an entirely different matter. Unlike the CPR regulation which is remedial in nature, these safety precautions are preventative in that they are designed to afford swimmers the ability to appreciate the change in depth and the means to either avoid the deep water or pull oneself free of the deep water with a safety line. Since the regulations do not require that the pool be monitored by a remote camera, these preventative safety measures are all the more vital to the safety of a lone swimmer.

¶70 Having invited Mark Schwabe to swim in its unattended defective pool, Custer's Inn should not be allowed to bootstrap its way into a summary judgment by arguing that, since no one else was present, the Estate is left with no direct proof as to how Mark drowned and thus its case must be dismissed. As the District Court initially recognized, this case "abounds with questions of material fact."

¶71 Finally, I turn to the requirements of § 50-53-107, MCA, which provide:

(1) Public swimming pools and public bathing places, including pool structures, methods of operation, source of water supply, methods of water purification, lifesaving apparatus, safety measures for bathers, and personal cleanliness measures for bathers, shall be sanitary, healthful, and safe.

(2) A lifeguard is not required for a privately owned public swimming pool if:

(a) a sign is prominently displayed on the swimming pool premises with the words "No lifeguard is on duty" or words of substantially the same meaning; and

(b) one individual per shift is on the premises, accessible to the pool, and currently certified as competent in cardiopulmonary resuscitation by either the American red cross or the American heart association.

¶72 The undisputed facts are that although Custer's Inn did have a "No Lifeguard on Duty" sign as required by subsection (a), it did not have a CPR-trained person on staff and accessible to the pool as required by (b). Thus, under the clear dictate of the statute, Custer's Inn was required to have a lifeguard on duty. The Court dismisses this point in a footnote stating that the Estate did not argue on appeal that there was a statutory duty to provide a lifeguard. The Estate did however raise the statute in its complaint, in its motion for summary judgment and, on appeal, cited the statute and argued that it is a criminal violation to operate a swimming pool in violation of the statute.

¶73 The statute requires that there be a lifeguard unless (a) there is a "No Lifeguard on Duty" sign and (b) there is CPR-trained person on the staff. In arguing that, in violation of the statute, there was no CPR-trained staff accessible to the pool, the Estate, by necessary implication argued that a lifeguard was required. If one argues, as the Estate did, that the provisions of § 50-53-107, MCA, have been violated, the only logical conclusion that can be drawn from that argument is that the entity in question failed to have either a sign and/or a CPR-trained person *and had no lifeguard on duty*. In other words, failure to have CPR-trained staff in itself does not constitute a violation. In addition to not having CPR-trained staff accessible, you must also fail to have a lifeguard on duty. The violation is the failure to provide the lifeguard. Obviously if there had been a lifeguard on duty, as required by law, the lifeguard would have been present to either prevent Mark from getting into distress or to render CPR assistance in a timely fashion.

¶74 Consistently with the *Johnson* case, I would hold that there are genuine issues of fact as to the cause of this drowning and that the District Court erred in granting summary judgment.

/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler and Justice William E. Hunt, Sr., join in the foregoing dissenting opinion.

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

¶75 I join Justice Leaphart's dissent, but add the following observation.

¶76 Section 50-53-107, MCA, requires that when a lifeguard is not provided at a privately owned public swimming pool, a person trained in cardiopulmonary resuscitation be on the premises and "accessible to the pool." A common sense interpretation of this requirement would mean that the person trained in CPR be in a position to administer CPR at a point in time when it would have some lifesaving and beneficial effect. The fact that Schwabe drowned in the unattended pool and was beyond resuscitation by the time he was found was a direct result of the Defendants' failure to comply with § 50-53-107(2)(b), MCA, by having someone trained in CPR accessible to the pool at a point in time when that person's assistance would make a difference.

¶77 I agree with Justice Leaphart that the majority opinion allows the Defendants' failure to comply with § 50-53-107, MCA, to insulate it from liability. Schwabe's family cannot prove why he drowned, nor that he could have been resuscitated because there was neither anyone there to observe him nor anyone accessible who could administer CPR in a timely fashion. No reasonable interpretation of the law would allow a defendant to benefit in this manner from its violation of the law.

¶78 For these reasons, I join in Justice Leaphart's opinion and dissent from the majority opinion.

/S/ TERRY N. TRIEWEILER

1. Subsection (2) under § 50-53-107, MCA, provides that "[a] lifeguard is not required for a privately owned public swimming pool if: (a) a sign is prominently displayed on the swimming pool premises with the words "No lifeguard is on duty" or words of substantially the same meaning; and (b) one individual per shift is on the premises, accessible to the pool, and currently certified as competent in cardiopulmonary resuscitation by either the American red cross or the American heart association." The undisputed facts show that a sign in compliance with subpart (a) was posted at the Custer's Inn pool facility, but that at the time of the drowning incident, no individual on the premises was certified in compliance with subpart (b). The Estate does not argue on appeal that the failure to fully comply with subparts (a) and (b) imposed a statutory duty on Custer's Inn to provide a lifeguard.